**NATIONWIDE MUTUAL INSURANCE COMPANY**

v.

**Robert SHOEMAKER, Administrator of the Estate of Brynn Shoemaker, deceased, et al.,**

**Civil Action No. 96–5357.**

United States District Court,

E.D. Pennsylvania.

June 11, 1997.

Kathleen M. Carson, Lisa B. Zucker, German, Gallagher & Murtagh, Philadelphia, PA, for Nationwide Ins. Co.

Edward L. McCandless, Jr., Leslie J. Castaldi, McCandless & Associates, Philadelphia, PA, for Joann H. Sizemore.

Stanley B. Gruber, Freedman and Lorry, P.C., Philadelphia, PA, for Thomas G. Laing.

Mary Wade Myers, West Chester, PA, for School House Inn.

## Opinion

LOUIS H. POLLAK, District Judge.

Nationwide Mutual Insurance Company ("Nationwide"), the plaintiff in this declaratory judgment action, has filed a motion seeking summary judgment and a declaration that its policy does not provide automobile liability coverage for the accident at issue in *Laing v. Robert Shoemaker, Administrator of the Estate of Brynn Shoemaker, et al.*, Civ. No. 96–4831, which case is also before this court. Defendant Thomas G. Laing has filed a response opposing the Nationwide's motion. Defendant Joann H. Sizemore, administratrix of the estate of Joseph Sizemore, has filed both a response opposing the motion and a cross-motion for summary judgment seeking a declaration that Nationwide's policy does provide coverage.[1]

Because the use of the car in this case falls within an exception to coverage in the policy in question, Nationwide's motion for summary judgment will be granted, and Sizemore's motion will be denied.

## I. *Background*

The facts of this case are in relevant part uncontested. On August 8, 1995, Brynn Shoemaker and Joseph Sizemore were killed, and Thomas Laing was injured, when the 1995 Plymouth Neon which Shoemaker was driving, and in which Sizemore was a passenger, crossed the center line and struck an oncoming vehicle driven by Laing. The Neon was owned by Brynn Shoemaker's grandmother, Gertrude, who had insured it under a policy issued by Old Guard Mutual Insurance Company. That policy contained a single limit of liability of $300,000.

At the time of the accident, Brynn Shoemaker was living with her parents, Nellie and Robert Shoemaker, who were at that time named insureds under an automobile liability policy issued by Nationwide which provided policy limits of $250,000 per person and $500,000 per occurrence. The policy contained language which provided that the insurance also applies to certain other motor vehicles as follows:

3. a motor vehicle owned by a non-member of your household ...

Nationwide's Century II Auto Policy, Sizemore Mem., exh. C at 7–8. The policy explicitly excluded coverage, however, if the vehicle was "furnished to you or a relative for regular use." *Id.* at 8. The term "regular use" was not defined in the policy except in the statement that "[f]urnished for regular use does not include a motor vehicle rented

---

1. Defendant Robert Shoemaker, administrator of the estate of Brynn Shoemaker, apparently did not answer the complaint in this action. Defendant School House Inn has been dismissed from the case by stipulation of all the parties. Joann Sizemore is not a party to the action docketed at Civ. No. 96–4831.

from a rental company for less than 28 days." *Id.*

Brynn Shoemaker had returned from a four-month trip to Mexico in mid-July, at which time she began using her grandmother Gertrude's Neon. Gertrude Shoemaker apparently preferred not to leave her house during "hot weather," Sizemore Mem., exh. B. at 12, and so allowed her granddaughter to use her car. For the first three or four days, Brynn returned the car to her grandmother's house each day. Because of the inconvenience of driving Brynn home after she returned the car, however, Gertrude Shoemaker decided to let Brynn keep the car at her parents' house, and to have Brynn pick her up and drive her when she needed to go out. Brynn proceeded to use the car on a daily basis, employing her grandmother's spare set of keys. This practice continued for approximately three weeks, until the accident on August 8.

The parties do not dispute that Gertrude intended to reclaim the car once the "hot weather" ended. Indeed, Gertrude purchased another car to replace the Neon after the accident.

On July 8, 1996, Thomas Laing filed an action seeking damages for injuries alleging arising from the accident. *See Laing v. Robert Shoemaker, Administrator of the Estate of Brynn Shoemaker, et al.,* Civ. No. 96–4831. On July 31, 1996, Nationwide filed this declaratory judgment action to determine whether it is obligated to provide coverage for the matters which are the subject of the action filed by Laing. Nationwide has now moved for summary judgment on the declaratory claim. Defendant Joann Sizemore has cross-moved for summary judgment.

This court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332. Plaintiff Nationwide is a corporate citizen of Ohio. Apart from Thomas Laing, who is a citizen of Delaware, the defendants are citizens of Pennsylvania. There is, therefore, complete diversity of citizenship among the parties. In addition, the amount in controversy exceeds $50,000, as required by 28 U.S.C. § 1332(a) as of the time the complaint was filed in July 1996. The action for declaratory judgment is properly brought pursuant to 28 U.S.C. §§ 2201, 2202.

## II. *Discussion*

A court may, of course, grant a motion for summary judgment only where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). All evidence must be construed in the light most favorable to the party opposing the motion. *Joseph v. Hess Oil,* 867 F.2d 179, 182 (3d Cir.1989).

"Generally, the proper construction of a policy of insurance is a matter of law which may properly be resolved by a court pursuant to a motion for summary judgment." *Nationwide Mut. Ins. Co. v. Nixon,* 453 Pa.Super. 70, 682 A.2d 1310, 1313 (1996) (quoting *Frain v. Keystone Ins. Co.,* 433 Pa.Super. 462, 640 A.2d 1352, 1354 (1994)). This is especially true "[w]hen the language is clear and unambiguous," *Nationwide Mut. Ins. Co. v. Nixon,* 453 Pa.Super. 70, 682 A.2d 1310, 1313 (1996). When, however, the language of the policy is ambiguous, the inquiry may be one for the trier of fact; indeed, in the case of an ambiguous provision, the court must "focus its attention on the reasonable expectations of the insured." *Id.* (quoting *Everett Cash Mut. Ins. Co. v. Krawitz,* 430 Pa.Super. 25, 633 A.2d 215 (1993)); *see also Loomer v. M.R.T. Flying Service, Inc.,* 384 Pa.Super. 244, 558 A.2d 103, 105 (1989) (holding ambiguous provisions are to be interpreted so as to provide maximum coverage to the insured). In other words, if the "regular use" provision at issue in this case is determined to be ambiguous, then summary judgment for Nationwide would likely be inappropriate, and a trial or possibly even summary judgment for Sizemore would be in order. Accordingly, the inquiry turns first to the question whether the "regular use" provision is ambiguous. *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980).

### A. *Ambiguity*

■ Terms of an insurance policy are regarded as ambiguous when they are "reasonably susceptible of more than one interpreta-

tion." *C.H. Heist Caribe Corp. v. American Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir.1981). A particular provision of an insurance policy is ambiguous "only if reasonably intelligent persons would honestly differ as to its meaning, when considering it in the context of the entire policy." *Federal Kemper Ins. Co. v. Ward*, 679 F.Supp. 489, 494 (E.D.Pa.1988), *aff'd*, 860 F.2d 1074 (3d Cir. 1988).

Courts have generally found the term "regular use" unambiguous. Indeed, it appears that every Pennsylvania state court to have considered the question has come to that conclusion. *See Crum and Forster v. Travelers Corp.*, 428 Pa.Super. 557, 631 A.2d 671, 673 (1993) ("The exclusionary language is not ambiguous"); *State Farm Mut. Auto. Ins. Co. v. Brnardic*, 441 Pa.Super. 566, 657 A.2d 1311, 1313 (1995), *alloc. denied*, 543 Pa. 695, 670 A.2d 142 (1995) ("insurance policy in question is clear"); *Kieffer v. Nationwide Mut. Ins. Co.*, 7 Pa. D & C.3d 293 (1978) ("Plaintiff argues that the provisions of the subject policy are ambiguous. We do not agree."). Courts in other jurisdictions have reached similar results. *See, e.g., Grange Ins. Ass'n v. MacKenzie*, 37 Wash.App. 703, 683 P.2d 221 (1984), *aff'd*, 103 Wash.2d 708, 694 P.2d 1087 (1985); *Woodman v. Hartford Accident & Indemnity Co.*, 27 Mass.App.Ct. 1120, 537 N.E.2d 601 (1989). In fact, defendant Sizemore [2] points to no case in which a court has found the term "regular use" ambiguous.[3]

Instead, Sizemore relies on the sentence that immediately follows the "regular use" exclusion in the Nationwide policy—"Furnished for regular use does not include a motor vehicle rented from a rental company for less than 28 days", *see* Sizemore Mem., exh. C at 8—and argues that Nationwide's failure to include clarifying language for non-rental situations dictates that the term "regular use" is ambiguous as it applies to the present case. Under Pennsylvania law, "[a]n insurer's failure to utilize more distinct lan-

guage which is available reinforces a conclusion of ambiguity." *McMillan v. State Mut. Life Assur. Co. of America*, 922 F.2d 1073, 1077 (3d Cir.1990). That is, a court should not impute to an insurance company "the benefit of qualifying language which it chose not to adopt." *Id.* at 1077 n. 4. Rather, a court may consider "whether alternative language, if used, would have put the matter beyond reasonable question." *Vlastos v. Sumitomo Marine & Fire Ins. Co. (Europe)*, 707 F.2d 775, 778 (3d Cir.1983). Because Nationwide clarified the meaning of "regular use" with respect to rental cars, Sizemore concludes, its failure to clarify the term in other contexts makes the term ambiguous as applied to the facts of the present case.

Sizemore's argument has some persuasive force. It can succeed, however, only if there exists "alternative language" which Nationwide could have adopted, but chose not to employ. Tellingly, Sizemore includes no such language. A bright-line temporal rule applying to car rentals is relatively simple to develop and apply. No such bright-line rule would seem to be readily available for cars borrowed from family members (or anyone else). *See State Farm Mut. Auto. Ins. Co. v. Townsend*, 361 N.W.2d 332 (Iowa App.1984) ("No hard and fast rule has been or can be established for determining the question of what constitutes furnishing for regular use, but each case must stand or fall on the particular facts"). When a car is rented, the transaction occurs against a detailed backdrop of rules allocating rights and responsibilities; there is, indeed, a written contract explicitly delineating those rights. No such clear "transaction" occurs when a person lends her car to a friend or a member of her family.

A temporal limit would not suffice to distinguish regular from irregular use in this noncommercial context. Rarely is an automobile lent or left for a particular time period, as it is in a rental situation. Indeed, a

---

2. Defendant Laing does not raise the issue of ambiguity in his response to Nationwide's motion for summary judgment.

3. Although such cases may exist, *see, e.g., Ricci v. U.S. Fidelity & Guaranty Co.*, 110 R.I. 68, 290

A.2d 408 (1972), they are not numerous. "The overwhelming weight of authority supports the view that 'regular use'... is not ambiguous." *Foster v. Johnstone*, 107 Idaho 61, 685 P.2d 802, 805 (1984).

car may not even be available for continuous usage, as a hired car is during the period of rental. *See, e.g., Knack v. Phillips,* 134 Ill. App.3d 117, 89 Ill.Dec. 185, 189, 479 N.E.2d 1191, 1195 (1985) (car driven only on weekdays, when owner was away at naval base).

Any attempt to define "regular use" in the context of an informal agreement between relatives or friends is further complicated by the range of purposes for which such agreements may be entered into. The agreements may include restrictions on operation of the car, *see Interinsurance Exchange v. Smith,* 148 Cal.App.3d 1128, 196 Cal.Rptr. 456 (1983) (driver did not have own set of keys and had to ask permission for each use); may have as their primary purpose storage rather than use, *see State Farm Mut. Auto. Ins. Co. v. Townsend,* 361 N.W.2d 332 (Iowa App.1984) (owner sought place to leave car while serving 30–day jail sentence); or may contemplate use for the benefit of the owner rather than the insured, *see Shelter Mut. Ins. Co. v. Tucker,* 864 F.2d 413 (6th Cir.1988) (applying Tennessee law) (car purchased so that members of insured's family could drive owner to appointments); *Giokaris v. Kincaid,* 331 S.W.2d 633 (Mo.1960) (driver had set of keys to her mother's car but drove it only when her mother needed a ride). Any of these factors—none of which is present in the rental car context—would complicate if not confound a search for a bright-line rule on what constitutes "regular use." Further, such agreements are generally informal matters, unarticulated by the terms of a written document. Key terms of the agreement (for insurance purposes) may—like the length of time Gertrude Shoemaker intended to let Brynn Shoemaker use her car—go unstated. In short, it does not appear to this court that clarifying language was in fact readily available to Nationwide in defining "regular use" in the non-rental context. Defendants have provided no example of such language to contradict the court's conclusion.

■ Defendants offer no other compelling argument for a determination that the term "regular use" is ambiguous. Indeed, courts

seem to have had little trouble defining the term—there appears to be a consensus that it refers, depending on the context, to "a principal use as distinguished from a casual or incidental use," *Crum and Forster v. Travelers Corp.,* 428 Pa.Super. 557, 631 A.2d 671 (1993), or "uninterrupted normal use for all purposes," *Central Security Mutual Insurance Co. v. DePinto,* 235 Kan. 331, 681 P.2d 15 (1984). Where courts have had difficulty is not in the definition of the term, but in its application.

### B. *The "regular use" exception*

Where, as here, jurisdiction is based upon the diverse citizenship of the parties and state substantive law governs, a federal court turns for guidance to the highest court of the state whose law is to be applied. The Pennsylvania Supreme Court has, however, made no authoritative pronouncement with regard to the "regular use" exclusion. Accordingly,

the task of a federal tribunal is to predict how the court would rule. To make this prognostication, [a court is] not inflexibly confined by dicta or by lower state court decisions, although [it] should look to such statements as indicia of how the state's highest court might decide.... The policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies and the decisions of other courts may also inform [its] analysis.

*McMillan v. State Mut. Life Assur. Co. of America,* 922 F.2d 1073, 1077 (3d Cir.1990).

### 1. *Pennsylvania cases*

Since the Pennsylvania Supreme Court has not addressed "regular use," it is appropriate to turn to the pertinent decisions of the Pennsylvania Superior Court and Pennsylvania's trial courts. These decisions teach that, as a general matter, exclusions from coverage are to be narrowly construed. *See Eichelberger v. Warner,* 290 Pa.Super. 269, 434 A.2d 747 (1981). The "regular use" exclusion in particular has been explicated by the Superior Court only once.[4] In *Crum and For-*

---

4. In *State Farm Mut. Auto. Ins. Co. v. Brnardic,* 441 Pa.Super. 566, 657 A.2d 1311 (1995), *alloc. denied,* 543 Pa. 695, 670 A.2d 142 (1995), the

Superior Court examined the "regular use" exclusion, but only to determine that it does not violate Pennsylvania public policy. Because the

*ster v. Travelers Corp.*, 428 Pa.Super. 557, 631 A.2d 671 (1993), the court, interpreting language very similar in relevant part to that at issue here [5], noted that "[c]ourts struggle" with application of the regular use exclusion "because each case must be decided on its own facts and circumstances...." *Id.* 631 A.2d at 673. The facts in that case involved a driver who had "driven the car owned by his grandparents on an average of five times per week for and during the entire four years preceding the accident" at issue. *Id.* at 674. The court observed that "[w]hether a vehicle is covered, or whether it is excluded under a provision denying coverage where such vehicle is furnished for the insured's (or family member's) regular use, normally becomes a jury question." *Id.* (quoting 6C Appleman, Insurance Law and Practice § 4455 at 565). The court went on to note that "[w]here the facts are not in dispute, however, and reasonable minds cannot differ regarding the result, the issue of coverage can be decided as a matter of law by the court.... This is such a case." *Id.* at 673–74.

Two decisions of the Court of Common Pleas, to which a federal court also may look as "indicia of how the state's highest court might decide," also address the "regular use" issue. In *Kieffer v. Nationwide Mut. Ins. Co.,* 7 Pa. D. & C.3d 293 (1978), a daughter worked during the week away from her parents' home and left her car there during the week; while she was away, the car was available to her mother "whenever she wanted." *Id.* at 298. The registration card and keys were left along with the car at the mother's home. The court found that the car was furnished for the regular use of the owner's family, including her mother.

In *Johnson v. Braunsberg*, 51 Pa. D. & C.2d 659 (1970), the owner of a car was inducted into the military and left his car with his father to be sold.[6] The father was unable to obtain a suitable offer for the car in the next two months; the owner's brother, who lived with his parents and thus was covered by their automobile insurance policy, made use of the car and was involved in an accident. The court found no "regular use" and thus no exclusion from coverage, because the automobile had been left to be sold and "any use was incidental to that purpose." *Id.* at 663. In the absence of evidence showing "frequent and regular" use of the car by the owner's brother, the court found that the car had not been "furnished for [his] regular use." The court observed that

> [i]n an age when relatives often lend their cars to one another, the restrictive interpretation urged upon us ... would create a wide gap in insurance coverage.... Insofar as there is an absence of exclusionary words which clearly relate to a specific factual situation, an insurance contract should be interpreted to provide coverage.

*Id.*

Finally, in *Federal Kemper Ins. Co. v. Ward,* 679 F.Supp. 489 (E.D.Pa.1988), *aff'd,* 860 F.2d 1074 (3d Cir.1988), my colleague Judge Van Antwerpen, applying Pennsylvania law, found that a truck was "furnished or available for ... regular use" by the person who was driving it at the time of an accident because—although the truck was titled in the name of the driver's fiancee—the driver had paid for the truck, drove it at least one quarter of the time, and often rode in it when his fiancee was driving.

The facts of the present case do not correspond directly with those of any of the four cases just discussed. At the time of the accident, Brynn Shoemaker had driven her grandmother's Neon for only three weeks, not four years as was the case in *Crum and Forster.* Nonetheless, the definition of "regular use" adopted by the *Crum and Forster* court is instructive: "principal use as distinguished from a casual or incidental use ...

---

parties had agreed that the exclusion, if valid, applied, the court did not have the opportunity to explore the scope of the term "regular use."

**5.** Whereas the policy in the present case excludes coverage for cars "furnished to you or a relative for regular use," the *Crum and Forster* policy excluded from coverage "[a]ny vehicle ... which is furnished or available for your regular use ...

or furnished or available for the regular use of any family member." 631 A.2d at 672.

**6.** The opinion in *Johnson v. Braunsberg* was written by my colleague Judge Ditter just a matter of months before he moved from the Court of Common Pleas to this court.

habitual use as opposed to occasional or incidental use." *Id.* 631 A.2d at 673 (internal quotation marks omitted). Brynn's use of her grandmother's car does fit both of these formulations of "regular use". She was the principal driver of the car during the period in question, and the car was her principal mode of conveyance; further, her use of the car during the three weeks she drove it was habitual rather than incidental or casual—that is, she drove it whenever she needed to go somewhere by car.

Although the opinion in *Kieffer v. Nationwide Mut. Ins. Co.* does not reveal how long the daughter had been working away from home, it does point to two important indicia of regular use: (1) blanket permission to use the car rather than having to request permission each time and (2) an available set of keys. Numerous cases from other jurisdictions have included these two factors as significant clues to the presence of regular use.[7] Brynn Shoemaker had (1) her grandmother's spare set of keys and (2) unrestricted permission to use the Neon.

The *Johnson v. Braunsberg* court decided that the exclusion did not apply, but rested its decision on two factors not present in the pending case. First, use of the automobile was secondary to its being stored pending sale; second, the insurance company proffered no information about the frequency and regularity of the driver's use of the car. Gertrude Shoemaker, on the other hand, lent the car to her granddaughter for the primary purpose of providing Brynn Shoemaker with a car to use for her own convenience; although the grandmother apparently called upon Brynn to drive her to the occasional appointment, it is clear from her deposition that this was not the primary purpose of the loan. As Gertrude Shoemaker described the arrangement, "I called her and she would take me if she could, if she wasn't busy doing something else." Sizemore Mem., exh. B at 19.

■ Finally, in *Federal Kemper Ins. Co. v. Ward,* the period of time during which the driver used the truck may well have been significantly greater than three weeks, but he drove it only one quarter of the time. If such use is "regular," then Brynn Shoemaker's temporary but nonetheless principal employment of her grandmother's car constitutes "regular use" as well.[8]

### 2. *Cases from other jurisdictions*

Although no party has pointed the court to cases from states other Pennsylvania, these cases offer a valuable judicial perspective on language that has, after all, appeared for decades in insurance policies around the country. *See McMillan v. State Mut. Life Assur. Co. of America,* 922 F.2d 1073, 1077 (3d Cir.1990); *see also* 8 A.L.R.4th 387 (1981).

---

7. *See, e.g., Seaboard Fire & Marine Ins. Co. v. Gibbs,* 392 F.2d 793, 797 (4th Cir.1968) ("The [driver in a different case] interpreted the terms of the permission as requiring further permission from the owner's wife each time she wanted to drive. Gibbs, however, was under no similar restriction."); *Farmers Ins. Co. v. Koehler,* 52 Wash.App. 822, 764 P.2d 1005 (1988); *Interinsurance Exchange v. Smith,* 148 Cal.App.3d 1128, 196 Cal.Rptr. 456 (1983). *Lumbermens Mut. Cas. Co. v. Lesley,* 433 So.2d 1299 (Fla.App. 1983); *Farmers Ins. Co. v. Zumstein,* 138 Ariz. 469, 675 P.2d 729 (App.1983).

8. It could be argued that three weeks—with projected use extending through the "hot weather"—is per se too short a period to establish regular use. Such an argument could seek to draw support from *Factory Mutual Liability Ins. Co. of America v. Continental Cas. Co.,* 267 F.2d 818 (5th Cir.1959) (applying Florida law), where the Fifth Circuit affirmed the district court's determination that a three-week car rental did not constitute "regular use." However, as explained *supra* in section II. A., there are strong policy reasons to separate the rental car and informal loan contexts. Specifically, in the context of a car lent by a family member, there are too many variables—ranging from the purpose of the loan to the restrictions placed on use of the car—for a simple temporal measure to be an effective means of measuring "regular use."

In any event, the period of time for which Brynn Shoemaker had possession of her grandmother's car must in this case be reckoned not as the three weeks that she actually drove it but as the full extent of the period—encompassing mid-July to the end of the "hot weather"—that Gertrude Shoemaker planned to let her use the car. While there is no indication in Gertrude Shoemaker's deposition, at least as excerpted in the papers before the court, of how long she generally considered the hot weather to continue, it seems fair to conclude that it extended beyond the date of the accident, August 8.

The North Carolina Supreme Court recently held, for example, that a van provided for transportation to and from work for eight weeks was considered to be furnished for "regular use." *North Carolina Farm Bureau Mut. Ins. Co. v. Warren,* 326 N.C. 444, 390 S.E.2d 138 (1990). This holding suggests that the fact that the provision of a vehicle is temporary—as in the present case—does not by itself bar an exclusion from coverage.

The cases in which courts have determined that exclusion is avoided generally contain significant factual differences from the case at bar. In some, the car was not used regularly. *See Jenkins v. Aetna Cas. & Sur. Co.,* 324 N.C. 394, 378 S.E.2d 773 (1989) (driver had used car, which was unregistered and not in good driving condition, once in two years). In other cases, the driver's use of the car was not unrestricted. *See Volpe v. Prudential Property & Cas. Ins. Co.,* 802 F.2d 1 (1st Cir.1986) (Breyer, then-Judge) (applying NH law) (insured did not have exclusive use of car for any significant part of day or week, and did not use car interchangeably with her own vehicle); *State Farm Mut. Auto. Ins. Co. v. Townsend,* 361 N.W.2d 332 (Iowa App.1984) (owner was serving 30-day jail term, and arrangement contemplated use of car by insured three or four times a week at most).[9] In still other cases, the primary purpose of the "loan" was something other than the driver's use of the car. *See Shelter Mut. Ins. Co. v. Tucker,* 864 F.2d 413 (6th Cir.1988) (applying Tennessee law) (automobile had been purchased by insured's wife's mother, who did not drive, so that others could transport her); *Giokaris v. Kincaid,* 331 S.W.2d 633 (Mo.1960) (automobile not furnished for daughter's "regular use" where daughter drove it only when her mother needed a ride).

Brynn Shoemaker, on the other hand, was given the Neon for her personal convenience, had unrestricted use of the car, and used the car regularly. Her use of the Neon seems therefore to fall within the contours of what courts in other jurisdictions have determined to be "regular use."

**9.** Compare *Spaulding v. Concord Gen. Mut. Ins. Co.,* 122 N.H. 515, 446 A.2d 1172 (1982), where the court found "regular use" because an inmate's friend had free use of the car, used it often for his own purposes, and parked it in his driveway—all factors which apply to Brynn Shoemaker's use of the Neon.

### 3. *Purpose of the exclusion*

A federal court seeking to predict how a state's highest court would rule should also consider the "policies underlying the applicable legal doctrines." *McMillan v. State Mut. Life Assur. Co. of America,* 922 F.2d 1073, 1077 (3d Cir.1990).

In *Crum and Forster,* the Pennsylvania Superior Court observed that

[t]he purpose of the ["regular use"] language was to provide coverage to the insured or members of her family while engaged in casual or infrequent use of a vehicle other than the one described in the policy, but not to cover the insured or members of her family with respect to another vehicle which he or she used or had the opportunity to use frequently. The policy language thus prevents the situation in which members of one household may have two vehicles which they can use interchangeably while insuring only one of them.

*Id.* 631 A.2d at 672–73. The court continued:

The clause in question represents an attempt on the part of the insurance company to strike a balance between the desire of the insured to be covered, even though not using his own car, and its own right to receive payment of premiums based upon the risk presented by the number of automobiles operated. It is generally held that such a clause covers the insured during infrequent or casual use of a nonowned automobile, but excludes coverage as to another's automobile which the policyholder frequently uses or has the opportunity to use.

*Crum and Forster,* 631 A.2d at 673 (quoting *Johnson v. Braunsberg,* 51 Pa. D. & C.2d 659, 661 (1970) (Ditter, J.)).

As then-Judge Breyer explained in *Volpe v. Prudential Property & Cas. Ins. Co.,* 802 F.2d 1, 3 (1st Cir.1986), "Some form of the 'regular use' exclusion is commonly found in

automobile insurance policies." Such an exclusion implicitly recognizes that

> 'a policy which would give to an insured who simply took out a policy on a single owned car, coverage on any number of cars not owned by him, but furnished for his regular use, just as if he owned them, would be ruinous to an insurance company. . . . [W]here more than one owned automobile is included, as a rule the insurance premium is larger.'

*Id.* at 3 (quoting *Globe Indemnity Co. v. Teixeira,* 230 F.Supp. 451, 455 (D.Hawai'i 1964), *aff'd,* 349 F.2d 502 (9th Cir.1965).) In other words, the exclusion "protects the insurer from multiple exposure to liability for which the insured pays only one premium."[10] *Id.*

The Pennsylvania Superior Court has confirmed that, under Pennsylvania law, "auto liability insurance follows car rather than driver; cost of insurance depends not only on insured's driving record but also on type of car." *State Farm Mut. Auto. Ins. Co. v. Brnardic,* 441 Pa.Super. 566, 657 A.2d 1311 (1995), *alloc. denied,* 543 Pa. 695, 670 A.2d 142 (1995). There is, therefore, "a tension between an insurance company's need to know what kind of cars their insureds drive, and the consumer's desire to have liability coverage extend to the occasional car not mentioned in the policy." *Id.* 657 A.2d at 1313.

Implicit in these pronouncements on policy is the notion that the reasonable expectations of both insured and insurer be met. Here, then, the question is whether Brynn Shoemaker's parents, whose policy covered her while she lived in their home, would "reasonably have expected to pay an extra premium to cover her use" of her grandmother's car, *Volpe,* 802 F.2d at 4. The Shoemakers might well have expected that Gertrude Shoemak-

er's policy would cover Brynn's use of the car—as indeed it did. But it would not have been reasonable for them to expect that their own policy, without an additional premium, should cover the potentially summer-long, unrestricted use by their daughter of a car that did not appear on their policy. Similarly, had Nationwide known of Brynn's ongoing use of the Neon for the duration of the "hot weather," it "can have reasonably expected to collect an extra premium" from the Shoemakers for Brynn's use of the car. *Id.*

In sum, the policies underlying the "regular use" exclusion, like the cases interpreting the exclusion, strongly suggest that the exclusion applies to the circumstances of this case.

### III. *Conclusion*

Returning then to the standard for summary judgment, the question is whether, taking the facts in the light most favorable to the nonmoving parties, the defendants have proffered evidence such that a reasonable factfinder could find that Brynn Shoemaker's use of the Neon was not "regular." I must answer that question in the negative. Although, as the court in *Crum and Forster* observed, whether the "regular use" exception applies "normally becomes a jury question," 631 A.2d at 673, there are cases in which "the facts are not in dispute . . . and reasonable minds cannot differ regarding the result." In such cases, the Pennsylvania Superior Court concluded, "the issue of coverage can be decided as a matter of law by the court. . . . This is such a case." *Id.* at 673–74.

The motion by plaintiff Nationwide seeking summary judgment and a declaration that it need not provide coverage for matters arising from the accident at issue will be grant-

---

**10.** In a similar vein, see Couch on Insurance 2d (Rev. ed.) § 45:1074:

> The purpose of the ["regular use"] provision in an automobile liability policy is to cover occasional or incidental use of other cars without the payment of an additional premium, but to exclude the habitual use of other cars, which would increase the risk on the insurer without a corresponding increase in the premium. The policy is not intended to cover the insured against personal liability with respect to his

> use of another automobile which he frequently uses or has the opportunity to use. More specifically, the evident intention of the limitation with respect to other automobiles is to prevent a situation in which the members of one family or household may have two or more automobiles actually or potentially used interchangeably but with only one particular automobile insured.

(Footnotes omitted). *See also* 86 A.L.R.2d 940 § 2.

ed. The motion by defendant Sizemore for summary judgment will therefore be denied.